## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNIVERSAL HEALTH SERVICES, INC.** : <br> **and UNIVERSAL HEALTH SERVICES, INC.** : <br> **FLEXIBLE BENEFIT PLAN, UHS DENTAL** : <br> **COMPONENT,** : <br> **Plaintiffs** : <br> : <br> : **Civil Action No. 02-2715** <br> **vs.** : <br> : <br> **AETNA, INC. and** : <br> **PRUDENTIAL INSURANCE COMPANY** : <br> **OF AMERICA,** : <br> : <br> **Defendants.** : <br> : | |

## ORDER

AND NOW, this _____ day of _____, 2002, upon consideration of

Defendant Prudential Insurance Company of America's ("PICA") Motion to Dismiss, or In The

Alternative, To Quash Purported Service Of Process, and any response thereto, it is hereby

ORDERED that Plaintiffs' Complaint is dismissed.

BY THE COURT:

_____

CLIFFORD SCOTT GREEN
United States District Judge

fps: 53969.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNIVERSAL HEALTH SERVICES, INC.<br>and UNIVERSAL HEALTH SERVICES, INC.<br>FLEXIBLE BENEFIT PLAN, UHS DENTAL<br>COMPONENT,<br>　　　　　　　**Plaintiffs**<br><br>　　　　vs.<br><br>AETNA, INC. and<br>PRUDENTIAL INSURANCE COMPANY<br>OF AMERICA,<br><br>　　　　　　　**Defendants.** | :<br>:<br>:<br>:<br>:<br>:<br>: **Civil Action No. 02-2715**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## ORDER

AND NOW, this _____ day of _____, 2002, upon consideration of Defendant Prudential Insurance Company of America's ("PICA") Motion to Dismiss, or In The Alternative, To Quash Purported Service Of Process, and any response thereto, it is hereby ORDERED that the alleged process and the purposed service of such process on PICA are quashed.

BY THE COURT:

_____
CLIFFORD SCOTT GREEN
United States District Judge

fps: 53969.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNIVERSAL HEALTH SERVICES, INC.<br>and UNIVERSAL HEALTH SERVICES, INC.<br>FLEXIBLE BENEFIT PLAN, UHS DENTAL<br>COMPONENT,<br>       **Plaintiffs** | : <br> : <br> : <br> : <br> : <br> : <br> : | |
|        **vs.** | : | **Civil Action No. 02-2715** |
| AETNA, INC. and<br>PRUDENTIAL INSURANCE COMPANY<br>OF AMERICA,<br>       **Defendants.** | : <br> : <br> : <br> : <br> : <br> : <br> : | |

## DEFENDANT PRUDENTIAL INSURANCE COMPANY OF AMERICA'S ("PICA") MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO QUASH PURPORTED SERVICE OF PROCESS

Defendant, Prudential Insurance Company of America ("PICA"), moves to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2), (b)(4), (b)(5), and (b)(6) (lack of jurisdiction over the person, insufficiency of process, insufficiency of service of process, and failure to state a claim, respectively).[1]    The reasons for dismissing Plaintiffs' Complaint are further set forth in the accompanying Memorandum of Law, which is incorporated herein by reference. In sum, not only have Plaintiffs failed to obtain proper process or properly serve it on PICA (and thus there is no jurisdiction over PICA), but the attempted claims are otherwise barred on their face based on Plaintiffs' own judicial admissions, under controlling principles of *res judicata*, the applicable statute of limitations, and other law recited in the

---

[1] The moving defendant herein is PICA. The other named defendant, Aetna Inc., is a separate entity, and does not own or operate PICA. Plaintiffs conceded in a recent motion requesting an extension of time to serve process, that Plaintiffs have not effected any service upon Aetna Inc. It is anticipated that Aetna Inc., through the undersigned counsel, will respond separately to Plaintiffs' motion for extension to permit untimely service.

Memorandum of Law.  In the alternative, PICA moves to quash the alleged process and the purported service of the alleged "summons," which is invalid because, *inter alia*, it was not issued by this Court and was not timely or properly served within the 120-day deadline under Rule 4.

Respectfully submitted,

OF COUNSEL:
ELLIOTT REIHNER SIEDZIKOWSKI
   & EGAN, P.C.

/s/Frederick P. Santarelli
JOHN M. ELLIOTT
FREDERICK P. SANTARELLI
Union Meeting Corporate Center
925 Harvest Drive
Blue Bell, PA  19422
(215) 977-1000

Counsel for Defendant, Prudential Insurance
Company of America.

DATED:  September 16, 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNIVERSAL HEALTH SERVICES, INC.<br>and UNIVERSAL HEALTH SERVICES, INC.<br>FLEXIBLE BENEFIT PLAN, UHS DENTAL<br>COMPONENT,<br><div align=center>**Plaintiffs**</div><br><div align=center>vs.</div><br>AETNA, INC. and<br>PRUDENTIAL INSURANCE COMPANY<br>OF AMERICA,<br><div align=center>**Defendants.**</div> | :<br>:<br>:<br>:<br>:<br>:<br>:  **Civil Action No. 02-2715**<br>:<br>:<br>:<br>:<br>:<br>: |

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT PRUDENTIAL INSURANCE COMPANY OF
AMERICA'S ("PICA") MOTION TO DISMISS, OR IN THE
<u>ALTERNATIVE, TO QUASH PURPORTED SERVICE OF PROCESS</u>

Defendant, Prudential Insurance Company of America ("PICA"), hereby submits this

Memorandum of Law in support of its Motion to Dismiss, Or In The Alternative, To Quash

Purported Service of Process of Plaintiffs, Universal Health Services, Inc. ("Universal") and

Universal Health Services, Inc. Flexible Benefit Plan, UHS Dental Component's (collectively,

"Plaintiffs").

**I.    <u>INTRODUCTION</u>**

The procedural history of this matter compels putting an end to it once and for all.

Universal is a multi-billion dollar corporation with substantial legal resources, and no legitimate

excuses for the failures, delays and lack of diligence in prosecuting this matter. Defendants

should not be forced to endure mounting costs from Universal's delays and otherwise meritless

litigation over the attempted claims, which are barred in any event on their face.

This is the second action and third complaint filed by Universal based on the same

alleged facts. Universal initiated the first action in *state* court, despite pleading claims that were

clearly completely preempted by ERISA (and that were otherwise meritless). The first action was removed to the Eastern District. Defendant, Aetna Inc. ("Aetna") moved to dismiss that Complaint. Universal did not oppose dismissal, and this Court therefore entered an Order dismissing the action. *See* Exhibit "1" (Order dated March 28, 2002 in 02-cv-0914). Under the express terms of Rule 41, that dismissal constituted a final adjudication on the merits.[1]

Plaintiff did not appeal the Order in that case. Nor could it genuinely do so in good faith, having not opposed dismissal and having not preserved any objection thereto. However, after the case was dismissed and marked "closed" by the Clerk, Universal filed what it termed a "revised" Complaint *in that closed docket*. This Court properly struck that "revised" or purported amended complaint. *See* Exhibit "2" (Order dated May 20, 2002 in 02-cv-0914).

Universal filed yet another complaint *as a separate action*, which is the action now before this Court. In doing so, Universal not only ignored the *res judicata* effect of the prior dismissal, but it also failed to disclose that this was a related case *vis a vis* the earlier one that this Court dismissed. The Clerk has since transferred the matter from Judge Dalzell to Judge Green, as Judge Green presided over and dismissed the first action.

After filing the separate action, Plaintiffs did nothing to advance it in this Court, despite the 120-day deadline under the federal rules to make proper service. *See* Fed.R.Civ.P. 4(m). As for "service" on PICA, Plaintiffs only very recently made an apparent effort to do so, through new counsel who recently entered an appearance. Plaintiffs do not even offer any excuse for the failure to make service by the other counsel, who has not withdrawn his appearance.

---

[1]  Rule 41(b) ("Involuntary Dismissal: Effective Thereof") provides "[u]nless the court in its order for dismissal otherwise specifies, a dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under rule 19, *operates as an adjudication upon the merits*." (Emphasis added).

In any event, as plainly demonstrated in the Argument section below, such purported eleventh-hour "service" by new counsel is patently deficient. Among other things, it seems Plaintiff merely mailed the complaint to a Roseland, New Jersey office that is not a proper service location for PICA, nor was the mailing addressed to any authorized officer or agent. Moreover, and even more fundamentally, the purported "summons" was not really a summons of this Court at all. Rather, it appears to be nothing more than a form on which Universal itself typed the Clerk's name -- making it appear as if it was actually issued by the Clerk, when in fact the docket and record shows no such summons has ever been issued by the Clerk As such, and as the Third Circuit has expressly and unequivocally cautioned District Courts and federal litigants, it is a nullity and a fatal defect requiring dismissal. *See Agres v. Jacobs & Crumplar*, P.A., 99 F.3d. 565, 569 (3d Cir. 1996).

As for Universal's failure to serve Aetna, Universal concedes that it failed to do so, in a September 9, 2002 motion requesting this Court to extend the 120-day deadline to effect service on Aetna. Conspicuously absent from this motion for extension to serve Aetna, is any allegation to support it, other than to say Universal's counsel, Mr. Ronald Meyer, did not take "appropriate" action. There is certainly no statement from Mr. Meyer for this Court (or Defendants) to evaluate for purposes of determining if there is any excuse, let alone "good cause" to justify any such extension.

In fact, other than saying Mr. Meyer did not act appropriately, Universal's motion avers no explanation whatsoever for this Court to even consider such a request. Indeed, Universal does not even plead, let alone prove, any basis for showing the "good cause" that would satisfy Rule 4(m) for such extensions of the 120-day deadline. *See Petrucelli v. Bohringer and Ratzinger*, 46 F.3d 1298, 1306-07 (3d. Cir. 1995) (affirmed finding of no "good cause" due to

3

"several inexcusable errors" by plaintiff's counsel, who failed to act with "reasonable care and diligence," and confirming it is not sufficient where there are "half-hearted efforts by counsel to effect service") and "[e]ven when delay results from inadvertence of counsel, it need not be excused.").

Moreover, aside from the absence of valid process, and/or the insufficiency of service of any valid process (and, thus, the absence of jurisdiction), and in addition to being barred on their face by *res judicata*, Plaintiffs' attempted claims are time-barred on their face under applicable statutes of limitations and are otherwise meritless. The Complaint should be dismissed.

## II.    ARGUMENT

### A. There Is No Valid And Sufficient Process, Or Service Of Process, On PICA And Consequently There Is No Personal Jurisdiction.

#### 1.    Invalidity And Insufficiency Of Process And Failure To Obtain Personal Jurisdiction.

The federal rules unequivocally mandate that "[t]he summons *shall* be *signed by the clerk*". Fed.R.Civ.P. 4(a) (emphasis added). Rule 4(b) further confirms that it is *the Clerk*, not parties or their attorneys, who have the power to issue federal court summonses that compel action and effect jurisdiction over defendants. *See* Fed.R.Civ.P. 4(b) ("the plaintiff may present a summons to the *clerk* for signature and seal. If the summons is in proper form, *the clerk shall sign, seal and issue* it to the plaintiff for service on the defendant.") (emphasis added).

The Third Circuit has resoundingly emphasized the crucial importance of the fact that process *must* issue and be signed by the Clerk of Court. In *Ayres v. Jacobs & Crumplar, P.A.*, 99 F.3d 565(3rd Cir. 1996), where the Court noted with respect to the summons that "the Clerk neither signed nor affixed the seal of the Court as required by Rule 4" (*id.* at 568), the Third Circuit held that "the failure of a plaintiff to obtain valid process from the court to provide it with

4

personal jurisdiction over the defendant in a civil case is fatal to the plaintiff's case. The parties cannot waive a void summons." *Id.* at 569.

In *Ayres*, rather than obtaining the summons from the Clerk of Court, the plaintiff (acting *pro se*) "obtained copies of summonses, filled in the name and address of defendants, and . . . had a process server agency serve the complaints and the unsigned summons on each of the defendants." *Ayres*, 99 F.3d at 567. The Third Circuit reiterated the District Court's observation that "the plaintiff had provided no excuse for her failure to comply with the Rule relating to service 'other than the fact that she simply did not think the 'technical niceties' of service of process important." *Id.* The Third Circuit rejected the plaintiff's cavalier disregard of rules as mere "technical niceties," and reiterated their vital importance in affirming the District Court's dismissal of the case.

In fact, the Third Circuit in *Ayres* addressed the issue head on, and its conclusion removes any doubt in this Circuit that service not signed and issued by the clerk of Court is invalid, and a fatal defect requiring dismissal:

> A summons which is not signed and sealed by the Clerk of the Court does not confer personal jurisdiction over the defendant. 2 James W. Moore, Moore's Federal Practice [Sec.] 4:05 (2d ed. 1996)(Under Rule 4(b) only the clerk may issue the summons . . . [A] summons issued by the plaintiff's attorney is a nullity. . . Upon proper motion, or if the defendant raises the matter in the responsive pleading, such suit should be dismissed under Fed.R.Civ.P. 12(b)(2). Thus, under such circumstances, it becomes unnecessary for the district courts to consider such questions as whether service was properly made, or whether an extension to the 120-day service period should be granted under Rule 4(m). [footnote omitted] Nor is it necessary for the district court to characterize such improper issuance as showing a flagrant disregard for the rules [citing, in a footnote, cases holding that "an unsigned summons demonstrates a flagrant disregard for the rules of procedure"].
>
> *       *       *

> In sum, we hold that a summons not issued and signed by the Clerk with the seal of the court affixed thereto fails to confer personal jurisdiction over a defendant even if properly served.

*Ayres*, 99 F.3d at 569-570.

The Third Circuit further underscored the significance of compliance with Rule 4 when it also held, in *Ayres*:

> We further hold that a summons when properly issued is not effective in conferring personal jurisdiction upon a partnership or individual if it is not served in accordance with Rule 4 of the Federal Rules of civil Procedure unless service has been effectively waived. In this instance, there was no such waiver.

*Ayres*, 99 F.3d at 570.

The importance of having process issued by the Clerk was also reinforced by the Court in *Barrett v. City of Allentown*, 152 F.R.D. 46, 49 (E.D.Pa. 1993), where the Eastern District Court dismissed the complaint and quashed service thereof, explaining:

> Additionally, the April 14th and May 28 attempts at service of the original complaint violated the provisions of Fed.R.Civ.P. 4(b), which requires that a summons be signed and sealed by the Clerk of the Court. ***Failure to have a summons signed by a clerk is a serious deficiency which cannot be overlooked***. [citations omitted]. ***An unsigned summons demonstrates a flagrant disregard*** for the rules of procedure and suggests that the summons was issued by a plaintiff and not the court Clerk.

*Barrett*, 152 F.R.D. at 49 (emphasis added).

This was underscored further in *Macaluso v. NY St. Dept. of Environ. Conserv.*, 115 F.R.D. 16, 18 (E.D.N.Y. 1986):

> This Court, however, does not view service of an unsigned, unsealed summons not issued by the court clerk as a mere technical defect. Instead, it amounts to a complete disregard of the requirements of process set forth clearly and concisely in Rule 4. accordingly, the court declines to exercise its discretion to grant leave to amend process.

The Court in *Macaluso* further explained:

> There is no reason, however, to countenance repeated failures to observe the clear and concise dictates of a federal Rule. Plaintiffs have set forth no reason to explain, and this Court sees no justification for, plaintiffs' inability to properly serve sufficient process under Rule 4 of the Federal Rules of Civil Procedure. For this reason, the service of improper process on July 10 and 11 is quashed, and the attempted service-by-mail [of proper process] on August 1 is quashed.

*Macaluso*, 115 F.R.D. at 19.

In this case, there are no excuses, and none that are even offered, or that could possibly be offered in good faith. Accordingly, the Complaint should be dismissed for insufficiency of process. In the alternative, the purported "process" or "summons" (and any alleged service thereof) should be quashed.

### 2.    Invalidity And Insufficiency Of Service of Process On PICA And Failure To Obtain Jurisdiction.

The Affidavit of Service filed by Plaintiffs' counsel is not the typical "return of service" affidavit that appears on the reverse side of the summons, as typically utilized in this Court and in the form approved by this Court. Consequently, Plaintiffs' Affidavit of Service does not include a copy of the actual "summons" that Plaintiffs claim to have served upon PICA. Accordingly, PICA is attaching a copy of the purported "summons" that was ultimately sent. See Exhibit "4."[2]

In any event, the "Affidavit of Service" does not show, nor even allege, that it was received by an officer, or any agent authorized to receive process on behalf of PICA. *See*

---

[2] As explained in detail above, this purported "summons" is not a summons at all under Rule 4, because the Clerk of Court did not issue it. The Court's docket does not reflect any summons being issued on the indicated date of August 22, 2002, and it is believed that Plaintiffs or their counsel typed the date and the name of the clerk on a form, to create a sort of "home-made" summons.

7

Exhibit "5" ("Affidavit of Service" filed by Plaintiffs' counsel filed 9/5/02). There is a copy of what appears to be a "return receipt" card attached to the Affidavit, however, it is blank in the section requiring the name of the person by whom it was received. *Id.* The signature itself is completely illegible, and has no indicia whatsoever of identity to determine if the person signing it was even an employee or agent of PICA in any sense, let alone one authorized to accept official service of process on behalf of the corporation. *Id.* Significantly, whoever said person was, he or she certainly did not identify himself or herself as an "Agent" or Addressee" in the place indicated on the form. *Id.*

The copy of the "return receipt" card is also blank where it is supposed to state the "Date of Delivery". *See* Exhibit "5." In fact, the Clerk of this Court expressly noted this fact on the docket for this case. *See* Docket Entry No. "7" (specifically noting "no date given" with respect to alleged date of service).

Further, the place of mailing, as indicated on the copy of the "return receipt" card, is not the proper office for service upon PICA, whose registered office is in Newark, New Jersey, not Roseland. *See* Exhibit "5." A call to the appropriate state government officials' offices in New Jersey would have readily disclosed this fact.

Accordingly, there is no showing whatsoever by Plaintiffs that the defective "summons" was even properly served upon PICA, which, in addition to the fatally defective summons itself, requires a finding that the court has not obtained jurisdiction over PICA. Of course, the time for doing so has already passed, as the 120-day deadline for service of process has expired. The Complaint should, therefore, be dismissed.

8

**B.    Plaintiffs Claims Are Barred By Res Judicata On Their Face.**

Dismissal of Plaintiffs' Complaint is appropriate because this Court has already previously dismissed the identical Complaint. Thus, the doctrine of res judicata applies to bar Plaintiffs' Complaint.

A final judgment on the merits precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Federated Department Stores v. Moitie*, 452 U.S. 394, 398 (1981). A determination in a previous action will preclude a plaintiff's claims in a second action where the determination meets the following criteria:

1.    there must have been a final judgment on the merits;

2.    the prior action must have involved the same parties or their privies;

2.    the prior action must have involved the same claim; and

4.    the judgment in the prior action must have been rendered by a court of competent jurisdiction.

*Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 963 (3d Cir. 1991); *Citibank, N.A. v. Data Lease Financial Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1990); *In re Teltronics Services, Inc.*, 762 F.2d 185, 190 (2d Cir. 1985); *Moore's Federal Practice 3d*, § 131.01.

Here, Universal filed a complaint alleging virtually identical facts. *See* Exhibit "3" (initial Complaint in 00-cv-0914). That action was dismissed by Order dated March 28, 2002. *See* Exhibit "1" (March 28, 2002 Order in 00-cv-0914). This Court was certainly a court of competent jurisdiction. Finally, the Court's dismissal operates as an adjudication on the merits. Under Rule 41(b), the dismissal constitutes an adjudication on the merits:

> Unless the court in its order for dismissal otherwise specifies a dismissal under this subdivision and any dismissal not provided for in this rule other than a dismissal for lack of jurisdiction, for

improper venue, or for failure to join a party under Rule 19,
**operates as an adjudication on the merits**.

Fed. R. Civ. P. 41(b) (emphasis added)  *See* also *Dougherty v. NYNEX Corporation*, 835 F.

Supp. 22, 23 (D. Maine 1993) (where dismissal resulted from plaintiff's failure to respond to a

motion to dismiss pursuant to Rule 12(b)(6), first dismissal acted as an adjudication on the merits

and barred second complaint).

Accordingly, on their face, Plaintiffs' claims in this action are barred by the dismissal in

the first action, which this Court can simply judicially notice from the Court's own records.

### B. Plaintiffs' Attempted Claims Are Time-Barred.

As a further basis for dismissal, Plaintiffs' attempted claims fail as a matter of law --

again, on their face --because they are time-barred under applicable statute of limitations.

There is no dispute that Plaintiffs' claims, if any, are brought under and governed by

ERISA. ERISA bars actions for breach of fiduciary duty "after the earlier of (1) six years after . .

. the date of the last action which constituted a part of the breach or violation, . . . or (2) three

years after the earliest date on which the plaintiff had actual knowledge of the breach or violation

. . .." 29 U.S.C. §1113. Plaintiff filed this action on May 7, 2002. Thus, if Plaintiffs had actual

knowledge of an alleged breach prior to May 7, 1999 - - as judicially admitted by Plaintiffs'

Complaint - - then this action is barred by ERISA's three (3) year statute of limitations.

The "actual knowledge" requirement of §1113(2) is defined by the Third Circuit Court of

Appeals as follows:

> "actual knowledge of a breach or violation" requires that a plaintiff
> have actual knowledge of all material facts necessary to understand
> that some claim exists, which facts could include necessary
> opinions of experts, ... knowledge of a transaction's harmful
> consequences,... or even actual harm . . . .

*Gluck v. Unysis Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992) (citations omitted). While PICA acknowledges that the "actual knowledge" requirement is to be stringently construed, *see International Union of Elec., Elec., Salaried, Mach. & Furniture*, 980 F.2d 889, 900 (3d Cir. 1992) ("Gluck therefore requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation under ERISA."), the Third Circuit's test is clearly met here. Importantly, the *Gluck* Court emphasized that "our holding does not mean that the statute of limitations can never begin to run until a plaintiff first consults with a lawyer." *Id.* at 1177.

"To determine the last action which constitutes the breach is equivalent to determining the event marking the first occasion on which it can be said that the breach has occurred." *Adelman v. Neurology Consultants,* 109 F.Supp.2d 400, 402-03 (E.D. Pa. 2000). Thus, "[w]hen a completed breach is alleged to have been repeated at a later time, the chronologically subsequent alleged breach does not, of course, negate the completed breach[.]" *Id.* at 403.

It is undisputed that Plaintiffs instituted this action on May 7, 2002. However, Plaintiffs' Complaint, as well as the exhibits attached thereto, judicially admit that Plaintiffs actually knew well in advance all alleged events that purportedly constituted the claimed breach or violation, and also that those supposed events supported their attempted claims here. Indeed, Universal actually sent a letter dated ***April 1, 1999***, confirming it was terminating the relationship due to the circumstances. Plaintiffs attached this letter to the complaint. *See* Exhibit "D" to Plaintiffs' Complaint.

Judicially admitting the untimeliness of Plaintiffs' claims, Plaintiffs' Complaint avers, *inter alia*:

11

13.    Effective on or about January 1, 1997, Plaintiff UHS entered into an Administrative Services Agreement (the ASO Agreement) with Prudential with respect to the Plan.

* * *

23.    ***Throughout the term of the ASO Agreement***, Prudential repeatedly and constantly failed to perform in accordance with the terms of the ASO Agreement. Prudential failed or was unable to accept and manage eligibility information provided by UHS; overpaid claims; paid claims to employees who were not eligible under the Plan; and billed UHS for fees for services related to employees who should not have been included in the Plan.

24.    Prudential's failure to perform ***occurred at the outset of the ASO Agreement and continued until the ASO Agreement was terminated.*** UHS, in numerous meetings, written correspondence, e-mails, and telephone calls gave notice to Prudential of Prudential's failure to perform.

25.    In correspondence dated ***November 5, 1997,*** Prudential specifically acknowledged and apologized for its systems problems.

* * *

27.    From January of 1997 until the termination of the ASO Agreement by UHS, Prudential paid an undetermined number of claims, but believed to be thousands, to ineligible employees resulting in substantial overpayments of benefits to the financial detriment of Plaintiffs.

28.    UHS made demand of Prudential to recover overpayments or to have Prudential pay such amounts to UHS. Prudential refused and failed to do so.

*See* Plaintiffs' Complaint at ¶¶ 13, 23-25, 27-28 (emphasis added).

In light of Plaintiffs' judicial admissions, and the documentary evidence supporting the admissions, it is beyond dispute that Plaintiffs' attempted ERISA claims are time-barred. The

Third Circuit's "actual knowledge" requirement is conclusively met, and Plaintiffs' claims fail as a matter of law on their face.[3]

## C. Plaintiffs' Purported Unjust Enrichment Claim is Barred Also Because It Is Preempted by ERISA.

Plaintiffs also purport to plead, as a supposedly separate claim, "unjust enrichment." This is merely a rehash of its "fiduciary duty" claim, and seeks the same relief provided by ERISA. To the extent Plaintiffs are purporting to say otherwise, any such claim cannot survive as a matter of law, and must be dismissed because it is preempted by ERISA. Because such a claim attempts recovery for breach of duties that are governed and regulated by ERISA, it must be asserted only under ERISA, which provides the exclusive law and mechanism for resolution of any such claims. *See Hein v. F.D.I.C.*, 88 F.3d 210 (3d Cir. 1996), *cert. denied*, 519 U.S. 1056 (1997).

The "unjust enrichment" claim seeks to vindicate the same interest as that enforced by ERISA's civil enforcement provisions. As such, this claim would fall directly under Section 502(a)(2), 29 U.S.C. § 1132(a), and/or Section 502(a)(3), 29 U.S.C. § 1132(a)(3). These sections provide for a civil action to be brought:

> (2)     by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title [relating to liability for breach of fiduciary duty];
>
> (3)     by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. §§ 1132(a)(2) and 1132(a)(3).[4]

---

[3] This is further reason that the Court should not give Plaintiffs a "second bite of the apple" regarding their utter lack of diligence and compliance with the federal rules regarding process and service. The claims are barred on their face not only by *res judicata*, but also applicable statutes of limitations.

The relief recoverable includes an award of accrued benefits, a declaratory judgment, or appropriate equitable relief. 29 U.S.C. § 1132(a). *See also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 43 (1987). These civil remedies cannot be supplemented or supplanted by attempts to plead state common law claims. As the Supreme Court has explained:

> the detailed provisions of § 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans. The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.

*Id.* at 54 (citing *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985)).

As detailed in Plaintiffs' complaint, the attempted unjust enrichment claim is indisputably rooted in Plaintiffs' assertions – which PICA disputes and will prove nonavailing – that Defendants breached duties with regard to the services to the ERISA plan. For example, Plaintiffs' "unjust enrichment" count alleges as follows:

> Plaintiff paid to Prudential, during the term of the ASO Agreement, fees substantially in excess of the amount properly due based upon eligibility, as a result of incorrect and improper billing by Prudential.

*See* Complaint at ¶ 52.[5]

This alleged "incorrect and improper billing" is one of the classic duties for which Prudential was named an ERISA fiduciary in the agreement between the parties. *See* Agreement

---

[4] Of course, as the employer/plan sponsor, Plaintiffs are fiduciaries under ERISA. *See Kendal Corp. v. Inter-County Hospitalization Plan, Inc.*, 771 F. Supp. 681, 684 (E.D. Pa. 1991) ("[A]s Plan sponsor and administrator, Kendal is a fiduciary pursuant to ERISA which provides that 'a person is a fiduciary with respect to a plan to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of such plan.'"). Here, there is no question that Universal, the employer sponsor of the health benefits plan, is seeking to recover monies through the Plan. Indeed, the caption further confirms this by expressly identifying the Plan itself.

[5] PICA strongly disagrees with such allegations. However, PICA also acknowledges that a court will not entertain factual disputes on a motion to dismiss.

attached to Complaint (naming Prudential an ERISA fiduciary for purposes of review and denial of claims, determining eligibility, determining the amount of benefits for each claim received, and to construe the terms of the Plan).

Indeed, in *Davis v. SmithKline Beecham Clinical Labs., Inc.,* 993 F.Supp. 897 (E.D. Pa. 1998), the court confirmed that an unjust enrichment claim based on alleged overpayments made by an ERISA plan was completely preempted by ERISA. *Id.* at 899. In concluding that the unjust enrichment claim was completely preempted, the court noted that "[t]he determination of the amounts of overpayments . . . will require the examination and interpretation of ERISA plans setting forth the criteria for calculating such payments." *Id.*

The court in *Davis* also noted that the plaintiff sought to vindicate "the same interest that the ERISA civil enforcement provisions allow. He seeks equitable relief for violations of the plan[.]" *Davis,* 993 F. Supp. at 899. *Id.* This holding is directly applicable to Plaintiffs' claims here, and is in accord with holdings from other courts. *See, e.g., Central States, Southeast & Southwest Areas Health & Welfare Fund v. Neurobehavioral Assoc.,* 53 F.3d 172 (7th Cir. 1995) (holding claims for overpayments brought by ERISA representatives against health care providers fall within ERISA's civil enforcement scheme); *Blue Cross & Blue Shield of Alabama v. Weitz,* 913 F.2d 1544, 1549 (11th Cir. 1990) (holding that an ERISA fiduciary's suit to recover money mistakenly paid to an unauthorized health care worker falls within ERISA's civil enforcement scheme).

Because ERISA prescribes the exclusive civil remedy for the conduct alleged herein, ERISA completely preempts the attempted unjust enrichment claim. *See Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58 (1987); *Dukes v. U.S. Healthcare,* 57 F.3d 350 (3d Cir.), *cert. denied,* 516 U.S. 1009 (1995); *District of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125,

127 (1992) ("ERISA sets out a comprehensive system for the federal regulation of private employee benefit plans, including both pension plans and welfare plans."). ERISA's "complete preemption" doctrine applies to claims for denial of benefits, as well as to claims for alleged breach of fiduciary duties. *Joyce v. RJR Nabisco Holdings Corp.*, 126 F.3d 166, 178 n.3 (3d Cir. 1997) ("This is consistent with the opinions of other Courts of Appeals, which have found that the complete preemption doctrine also applies to claims of breaches of fiduciary duties under §502(a)(3).").

In addition to being completely preempted, Plaintiffs' unjust enrichment claim is otherwise preempted also under ERISA's general preemption provision set forth in Section 514(a) because it "relates to" an employee benefit plan. *See, e.g., Nealy v. U.S. Healthcare HMO*, 844 F. Supp. 966, 975 (S.D.N.Y. 1994); *McLean v. Carlson Companies, Inc.*, 777 F. Supp. 1480 (D. Minn. 1991). ERISA's broad preemption provision, set forth in § 514(a), states:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan described in § 1003(a) of this title and not exempt under § 1003(b) of this title . . ..

29 U.S.C. § 1144(a) (emphasis added). The phrase "relates to" in Section 514(a) has been interpreted to mean that "it has a connection with or reference to such a plan." *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85 (1983); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987).

Examining the purpose of § 514, the Supreme Court in *Pilot Life* observed that "the express preemption provisions of ERISA are deliberately expansive, and are designed to 'establish pension plan regulations as exclusively a federal concern.'" *Pilot Life*, 481 U.S. at 45-56 (citations omitted). In *Pilot Life*, the plaintiff alleged claims under state law for breach of contract, breach of fiduciary duty, and fraud in the inducement. Because the Court found that

each of these claims related to the purported improper processing of a claim under an ERISA plan, the Court held that all of the plaintiff's claims were preempted by ERISA. *Id.* at 47-48. The Court reiterated its expansive interpretation of the "relate to" language in § 514(a), and found that any state law that has a "connection with or reference to" an ERISA plan is preempted. *Id.* at 47.

Notably, other courts have analyzed claims by employers that are virtually identical to the misconduct alleged by Plaintiffs here and have concluded that such claims are preempted by ERISA. In *Tri-State Machine, Inc. v. Nationwide Life Insurance Co.*, 33 F.3d 309 (4th Cir. 1994), the court addressed the identical allegations asserted by Plaintiffs against Aetna, including that Nationwide was "paying claims to the wrong medical providers . . . paying claims not covered, denying claims that were covered . . ." *Id.* at 314.

In holding that the employer's state-law claims were preempted by ERISA, the court emphasized that

> ***all of these allegations are essentially complaints about the processing of claims under an employee benefit plan and, therefore, relate to the plan in the common sense meaning of that phrase.*** Indeed, the Supreme Court in *Pilot Life* specifically stated: 'The common law causes of action raised in [Plaintiff's] complaint, each based on alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for preemption under §514(a)."

*Id.* 314 (emphasis added) (citing *Pilot Life*, 481 U.S. at 48). *See also Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 273 (3d Cir. 2001) (noting that a claim regarding "the proper administration of benefits" by an HMO is preempted by ERISA).

Moreover, in *Insurance Board of Bethlehem Steel Corp. v. Muir*, 819 F.2d 408 (3d Cir. 1987), another case addressing a claim relating to the administration of an ERISA plan by an insurer, the court found that the claims were preempted. The court framed the issue as "whether

an insurer who sells certain administrative services to an ERISA plan thereby engages in the business of insurance so as to be the subject to state regulations." *Id.* at 411. If so, the claims may fall within ERISA's "savings clause," and would not be preempted. *Id.*

The "certain administrative services" described by the court were the same as those at issue here - - administrative services that included the processing of claim forms, initial determinations as to coverage and when claims are determined to be valid. *Id.* at 409. Applying U.S. Supreme Court precedent, the court held that the insurer's role in providing "administrative services" was insufficient to prevent ERISA preemption. Id. at 413. *See also O'Reilly v. Ceuleers*, 912 F.2d 1383, 1389 (11th Cir. 1990) ("When an insurance company merely acts as an administrator, its activities are not within the insurance exception savings clause.").

The Third Circuit has stated that a state law claim is preempted by ERISA if: (1) the existence of an ERISA plan is critical to establish liability, and (2) the court's inquiry would be directed to the plan." *1975 Salaried Retirement Plan for Eligible Employees of Crucible, Inc. v. Nobers,* 968 F.2d 401, 406 (3d Cir. 1992). Moreover, the Third Circuit has recently clarified that, while suits against plan administrators are not preempted if they concern "the quality of the medical treatment performed," they are completely preempted if they challenge "the administration of or eligibility for benefits." *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 272-73 (3d Cir. 2001).

Accordingly, various courts have specifically found that unjust enrichment claims, which relate to an employee benefit plan are preempted. *See Buxton v. Consolidated Rail Corp.,* 1999 U.S. Dist. LEXIS 186, *22 (E.D. Pa. Jan. 6, 1988) ("[ERISA] preemption encompasses actions for fraud, negligence, breach of contract, and unjust enrichment which relate to an employee benefit plan."); *Bunnion v. Consolidated Rail Corp.,* 1998 U.S. Dist. LEXIS 219, *27 (E.D. Pa.

18

Jan. 6, 1998) ("unjust enrichment claims are preempted by ERISA if they relate to an employee benefit plan."); *Wassil v. Advanced Tech. Labs, Inc.*, 1996 U.S. Dist. LEXIS 6107 (E.D. Pa. May 7, 1996) (ERISA preempts breach of contract and unjust enrichment claims).[6]

Application of this controlling precedent to the instant case compels the conclusion that Plaintiffs' attempted "unjust enrichment" claim directly relates to an employee welfare benefit plan and is, therefore, preempted by ERISA's broad preemption provision. *See Pilot Life*, 481 U.S. at 47-48; *Ramirez v. Inter-Continental Hotels*, 890 F.2d 760, 764 (5th Cir. 1989). As such, Plaintiffs' attempted unjust enrichment claim fails as a matter of law on its face.

## III.    CONCLUSION

For all of the foregoing reasons, PICA respectfully requests that this Court dismiss Plaintiffs' Complaint. In the alternative, PICA requests that, at a minimum, the Court quash the purported "summons" and any alleged service of the invalid "summons".

Respectfully submitted,

OF COUNSEL:
ELLIOTT REIHNER SIEDZIKOWSKI
   & EGAN, P.C.

/s/Frederick P. Santarelli
JOHN M. ELLIOTT
FREDERICK P. SANTARELLI
Union Meeting Corporate Center
925 Harvest Drive
Blue Bell, PA 19422
(215) 977-1000

Counsel for Defendant, Prudential Insurance
Company of America.

DATED: September 16, 2002

---

[6] Even if Plaintiffs' unjust enrichment claim was not preempted, the claim could not survive because it is not needed to "fill in interstices of ERISA." *Jordan v. Federal Express Corp.*, 116 F.3d 1005, 1018 (3d Cir. 1997). In *Jordan,* the Third Circuit held that federal common law shall only be used in ERISA cases when "necessary to fill in interstitially or otherwise effectuate the statutory pattern enacted in the large by Congress." *Id.* at 1017-18. Because Plaintiffs' unjust enrichment claim is not needed to effectuate ERISA, it must be dismissed. *Id. See also Bennett v. Conrail Matched Sav. Plan Admin. Comm.,* 1997 U.S. Dist. LEXIS 17295, *26 (E.D. Pa. Oct. 30, 1997).

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day a copy of the foregoing is being served upon

the persons and in the manner indicated below:

### U.S. Postal Service, First Class Mail

Ronald K. Meyer, Esquire
303 W. Lancaster Avenue, #101
Wayne, PA 19087
(610) 889-9339
(Counsel for Plaintiffs)


William J. Brennan, Esquire
Butera, Beausang Cohen Brennan
630 Freedom Business Center
Suite 212
King of Prussia, PA 19406
(610) 265-0800
(Co-counsel for Plaintiffs)

/s/Frederick P. Santarelli
FREDERICK P. SANTARELLI

DATED:  September 16, 2002

# EXHIBIT 1

P. 02

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNIVERSAL HEALTH SERVICES, INC.,   :
        Plaintiff,              :     CIVIL ACTION
                                   :
     v.                  :     NO. 02-914
AETNA U.S. HEALTHCARE and    :
PRUDENTIAL U.S. HEALTHCARE,  :
        Defendants.      :

**FILED**

MAR 2 8 2002

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## ORDER

Presently before the Court is Defendants' Motion to Dismiss. Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's Complaint because Plaintiff's state law claims are preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). (See Dfdts.' Mem. of Law at 3.) In the alternative, Defendants move pursuant to Federal Rule of Civil Procedure 12(e) to have Plaintiff file a more definite statement as to the identity of the party(ies) being sued. (See Dfdts.' Mem. of Law at 8.) Plaintiff initially filed its Complaint in the Court of Common Pleas of Montgomery County, and Defendants filed a timely Notice of Removal in this Court. Plaintiff's Complaint contains four counts against Defendants: Count I alleges Breach of Contract; Count II is for Unjust Enrichment; Count III is for Misrepresentation; and Count IV sounds in Negligence. All of these claims are based on state law, and Defendants allege that all claims are preempted by ERISA. (See Dfdts.' Mem. of Law at 3.) According to the Certificate of Service attached to Defendants' motion, Defendants served the Plaintiff March 1, 2002. To date, Plaintiff has not filed a response to the motion. Therefore, pursuant to Local Rule of Civil Procedure 7.1(c), I will grant Defendants' motion as uncontested.

**AND NOW,** this _28th_ day of March, 2002, upon consideration of Defendants'

Motion to Dismiss, **IT IS HEREBY ORDERED** that Defendants' motion is **GRANTED**. The above-captioned action is **DISMISSED** as to both Defendants.

BY THE COURT:

CLIFFORD SCOTT GREEN, S.J.

ENTERED

MAR 2 9 2002

CLERK OF COURT

2

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNIVERSAL HEALTH SERVICES, INC., :
             Plaintiff, :     CIVIL ACTION
                        :
           v.         :
                        :
AETNA U.S. HEALTHCARE and :     NO. 02-914
PRUDENTIAL U.S. HEALTHCARE, :
             Defendants. :

**FILED**

MAY 20 2002

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## ORDER

Presently before the Court is Defendants' Motion to Strike Plaintiff's Amended

Complaint. Defendants move pursuant to Federal Rule of Civil Procedure 12(f). On March 28,

2002, the Court granted Defendants' motion to dismiss Plaintiff's Complaint as uncontested. On

or about April 3, 2002, Plaintiff filed an Amended Complaint. Defendant asks the Court to strike

Plaintiff's Amended Complaint, arguing that it was filed after the case was closed, and Plaintiff

never asked the Court to reconsider or vacate the order dismissing Plaintiff's Complaint.

According to the Certificate of Service attached to Defendants' motion, Defendants served the

Plaintiff April 24, 2002. In a letter to the Court from Plaintiff's counsel dated May 13, 2002,

Plaintiff stated its intention to enter into a stipulation with the Defendants to withdraw the

Amended Complaint. To date, however, no stipulation has been filed, and Plaintiff has not filed

a response to Defendants' motion. On May 15, 2002, Defendants filed a certification pursuant to

Local Rule 7.1(b), asking that the Court grant the Motion to Strike as uncontested because

Plaintiff had failed to respond. Therefore, pursuant to Local Rule of Civil Procedure 7.1(c), I

will grant Defendants' motion as uncontested.

     **AND NOW**, this _____20_____ day of May, 2002, upon consideration of Defendants'

Motion to Strike, **IT IS HEREBY ORDERED** that:

1) Defendants' motion is **GRANTED**, and Plaintiff's Amended Complaint is **STRICKEN**;

2) The letter from Plaintiff's counsel dated May 13, 2002, is to be **FILED AND DOCKETED**.

BY THE COURT:

_____
CLIFFORD SCOTT GREEN, S.J.

5-21-02 mailed
Meyer

**ENTERED**

MAY 2 1 2002

CLERK OF COURT

2

# EXHIBIT 3

RONALD K. MEYER, ESQ.
303 W. Lancaster Ave.
# 101
Wayne, Pa. 19087
(610)-889-9339
Identification No. 18776

**Attorney for Plaintiff**
**Jury Trial Waived**

| | | |
|---|---|---|
| Universal Health Services, Inc.<br>367 South Gulph Road<br>King of Prussia, Pa. 19406 | : | **Court of Common Pleas** |
| | : | **Montgomery County** |
| | : | |
| vs. | : | |
| | : | |
| Aetna U.S. Healthcare<br>2201 Renaissance Blvd.<br>F245<br>King of Prussia, Pa. 19406 | : | 02 - 01412 |
| | | |
| Prudential US Healthcare<br>2201 Renaissance Blvd.<br>F245<br>King of Prussia, Pa. 19406 | : | |

## Complaint - Civil Action
### Notice

You have been sued in court. If you wish to defend yourself against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served on you by entering a written appearance by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. If you fail to do so, the case may proceed without you, and a judgment may be entered by the court against you without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money, property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

Montgomery County Bar Association                      215-279-9660
100 West Airy Street - P.O. Box 268
Norristown, Pa. 19401                                  215-279-9669

## Introduction

1.      Plaintiff is a corporation with its principal place of business at 367 South Gulph Road, King of Prussia, Pa. 19406.

2.      Aetna US Healthcare (hereinafter, Aetna) is a business, company, franchise, entity, partnership, or corporation existing and/or qualified under the laws of the Commonwealth of Pennsylvania with offices at 2201 Renaissance Blvd., F245, King of Prussia, Pa. 19406.

3.      Plaintiff employs approximately thirty thousand individuals to whom it offers and provides a variety of benefits including healthcare programs.

4.      Aetna directly or through subsidiaries offers various health benefits plans or provides administrative services for such plans.  Aetna operates as what is commonly referred to as a managed care company and as an administrative service organization, or "ASO" to provide such benefits.

5.      Prudential Insurance Company of America was a life and health insurance company qualified to do business in the Commonwealth of Pennsylvania and through its wholly owned subsidiary, Prudential HealthCare, provided certain administrative services in connection with health insurance plans offered by employers.  Prudential HealthCare (hereinafter "Prudential") also operated as a managed care company and/or as an ASO.

6.      On or about January 1, 1999, Aetna acquired Prudential Healthcare and thereby became the successor to all rights and liabilities of Prudential relevant to the matters set forth in this complaint. Attached hereto as Exhibit A is an announcement by Prudential with respect to such acquisition.

7.    Among other benefits provided to employees, Plaintiff offered a dental benefits plan (the Plan).

8.    The Plan was a self-insured plan whereby the Plaintiff paid the benefits on behalf of or to covered employees in accordance with eligibility and benefit criteria.

9.    Plaintiff determined the eligibility and benefit criteria.

10.    Effective on or about January 1, 1997, Plaintiff entered into an Administrative Services Agreement (the ASO Agreement) with Prudential with respect the Plan. A copy of the Agreement is attached hereto as Exhibit B.

11.    In excess of 15,000 employees were eligible and covered under the Plan.

12.    Under the terms of the ASO Agreement, Prudential was to provide, for a fee, all administrative services associated with the Plan including network services, claims processing, administrative services and material. During the term of the ASO Agreement, Plaintiff paid Prudential approximately $1,500,000 in such fees based upon invoices submitted by Prudential to Plaintiff.

13.    Under the terms of the ASO Agreement, Plaintiff was to determine the eligibility of employees under the Plan and provide data with respect to eligible employees in accordance with instructions and standards provided by Prudential.

14.    Under the terms of the ASO Agreement, Plaintiff determined benefits to be provided to covered employees under the Plan.

15.    Under the terms of the ASO Agreement, Prudential was to determine if employees submitting claims were eligible and covered under the Plan according to the criteria established by Plaintiff.

16.    Under the terms of the ASO Agreement, Prudential had the obligation to process claims only in accordance with the Plan provisions.

17.    Under the terms of the ASO Agreement, on a regular basis, Plaintiff provided updated data on eligible employee information so that terminated employees would be dropped from the Plan and new employees could be added.

18.    Prior to entering into the ASO Agreement, Prudential represented that it was an expert in the field of providing ASO services, and that it had state of the art systems and technology to provide the services contracted for.

19.    Under the terms of the ASO Agreement, Prudential was obligated to perform at a level no less than general industry standards of care.

20.    Throughout the term of the ASO Agreement, Prudential repeatedly and constantly failed to perform in accordance with the terms of the ASO Agreement. Prudential failed or was unable to accept and manage eligibility information provided by Plaintiff; overpaid claims; paid claims to employees who were not eligible under the Plan; and billed Plaintiff for fees for services related to employees who should not have been included in the Plan.

21.    Prudential's failure to perform occurred at the outset of the ASO Agreement and continued until the ASO agreement was terminated. Plaintiff, in numerous meetings, written correspondence, e-mails, and telephone calls gave notice to Prudential of Prudential's failure to perform.

22.    In correspondence dated November 5, 1997, Prudential specifically acknowledged and apologized for its systems problems. A copy of said correspondence is attached hereto as Exhibit C.

23.    Under the terms of the ASO Agreement, Prudential had an obligation to seek repayment of overpayments on claims or to make payment to Plaintiff for such amounts.

24.    From January of 1997 until the termination of the ASO Agreement by Plaintiff, Prudential paid an undetermined number of claims, but believed to be thousands, to ineligible employees resulting in substantial overpayments of benefits to the financial detriment of Plaintiff.

25.    Plaintiff made demand of Prudential to recover overpayments or to have Prudential pay such amounts to Plaintiff. Prudential refused and failed to do so.

26.    Prudential continued to fail to properly perform for over a two-year period. On April 1, 1999 Plaintiff terminated the ASO Agreement, effective June 1, 1999, citing the failure of Prudential to properly process the eligibility of covered employees. A copy of this correspondence is attached hereto as Exhibit D.

27.    Thereafter, Plaintiff retained the services of Metropolitan Life Insurance Company (Met) as the ASO for the Plan and provided to Met the same data it had been providing to Prudential. Upon receipt of the information and routine processing, the number of eligible employees as reported by Met was reduced by approximately 2500 compared to the number of eligible employees that had been reported by Prudential.

28.    After the termination of the ASO Agreement, Plaintiff had direct dealings with Aetna.

29.    Aetna acknowledged its assumption of the liabilities of Prudential under the ASO Agreement.

### Count I, Breach of Contract

30.    Plaintiff repeats and incorporates by reference thereto paragraphs one through twenty-nine, inclusive as though set forth at length herein.

31.    Prudential failed to perform at a level consistent with industry standards as required by the ASO Agreement.

32.    Prudential accepted claims for processing and payment, and paid claims on behalf of, employees who were not eligible under the provisions of the Plan.

33.    Prudential paid benefits in excess of the amount of benefits properly payable under the provisions of the Plan.

34.    Prudential, after repeated notice by Plaintiff, refused to attempt to recover overpayments, and failed and refused to correct its systems and procedures to properly manage the information with respect to benefits and eligibility.

### Count II, Unjust Enrichment

35.    Plaintiff repeats and incorporates by reference thereto paragraphs one through thirty-four inclusive as though set forth at length herein.

36.    Prudential's was compensated by the payment by Plaintiff of fees based upon the number of eligible employees covered under the Plan, and Prudential submitted invoices for fees to Plaintiff for such payments.

37.    Plaintiff paid to Prudential, during the term of the ASO Agreement, fees substantially in excess of the amount properly due based upon eligibility, as a result of incorrect and improper billing by Prudential.

### Count III, Misrepresentation

38.     Plaintiff repeats and incorporates by reference thereto paragraphs one through thirty-seven, inclusive as though set forth at length herein.

39.     Prudential misrepresented to Plaintiff its qualifications and experience related to the services to be performed under the ASO Agreement, and Plaintiff relied upon such misrepresentations to its detriment.

40.     Prudential misrepresented the technological capabilities, the skill of its information technology staff, and its general resources with respect to the systems utilized to manage its obligations under the terms of the ASO Agreement, and Plaintiff relied upon such misrepresentations to its detriment.

### Count IV, Negligence

41.     Plaintiff repeats and incorporates by reference thereto paragraphs one through forty, inclusive as though set forth at length herein.

42.     Prudential failed to act in a manner consistent with reasonable and customary standards of care and diligence.

43.     Plaintiff reasonably relied on the belief that Prudential would act in a manner consistent with reasonable and customary standards of care and diligence.

### Claim for Damages

Plaintiff has suffered damages as a direct and proximate result of the foregoing acts, omissions, breaches of contract, acts of negligence and misrepresentations of Prudential including but not limited to overpayment of claims to ineligible employees, overpayments of benefits to eligible employees, overpayment of fees paid with respect to ineligible employees, payment of audit fees to review the performance of Prudential

under the ASO Agreement, substantial use of executive and staff time devoted to the matters that are the subject of this complaint, systems and processing time and expense, and legal and accounting fees.

WHEREFORE, Plaintiff demands of Defendants damages not less than $300,000 together with reasonable interest, attorney's fees, and costs.

Ronald K. Meyer, Esq.

Attorney for Plaintiff

## VERIFICATION

Nancy Kurtzman, being duly sworn according to law, deposes and says that she is the

Director of Employee Benefits of Universal Health Services; that she is familiar with the

facts and matters set forth in the foregoing pleading; and that the facts set forth therein

are true and correct to the best of her knowledge, information and belief. This statement

is made subject to the penalties of 18 PA.C.S., Section 4904 relating to falsification of

statements to authorities.

Dated: _1/17/02_

_Nancy Kurtzman_
 - Director of Employee Benefits
 Universal Health Services, Inc.

## EXHIBIT A

**Announcement of purchase of Prudential**

 **Prudential**

**Steven J. Shulman**
President and Chief Executive Officer

**Prudential HealthCare**
56 Livingston Avenue, Roseland NJ 07068

steve.shulman@prudential.com

December 11, 1998

Dear Prudential HealthCare Client:

By now I hope you have heard that yesterday we announced the sale of Prudential HealthCare to Aetna U.S. HealthCare to form the largest managed care company in the United States. The combined entity will also become the country's premier managed dental provider. I wanted to take a moment to share with you some of the details as well as my perspective on the deal.

I strongly believe that this combination will result in great value for our clients and members. Specifically, the new company will offer you and your employees:

♦ Access to an even larger national provider network;
♦ Greater opportunities for enhanced products and services;
♦ Continued commitment to quality health care at affordable prices;
♦ Vast depth of experience in addressing member needs in a managed care setting.

The sale includes Prudential HealthCare's HMO, POS, PPO and indemnity health lines and the dental operation. The sale will not have an impact on any Prudential Group Life & Disability Insurance coverage as that business will remain part of Prudential's Institutional division.

It is also important to note that your employees will continue to receive the same benefits and premiums for the contract period in effect when the transaction is finalized. We expect the transaction to be finalized in the second quarter of next year.

We are extremely excited about creating the premier provider of health benefits in this country. As we integrate our businesses, we hold a shared commitment to the health of our members and continued service to meet your needs.

Many of the details of the transaction are still being finalized, and we expect to have more information to share between now and the time the transaction is finalized. In the meantime, please contact your Prudential HealthCare representative if you have questions.

We greatly appreciate your business, and your support, and we look forward to serving you in the years to come.

Sincerely,

Steve Shulman
Prudential HealthCare
President & CEO

A Division of The Prudential Insurance Company of America

# EXHIBIT B

## ASO Agreement

## ADMINISTRATIVE SERVICES AGREEMENT

AGREEMENT NO. 23794

effective January 1, 1997

between

### THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
(The Prudential)

and

### UNIVERSAL HEALTH SERVICES, INC.
(Purchaser)

The Purchaser offers the Plan of Benefits described in Exhibit A (herein called Plan) for the benefit of the classes of persons set forth in that Exhibit.

The Prudential has entered directly or indirectly into agreements with certain professional providers of dental services including, but not limited to, doctors who are dentists, periodontists, oral surgeons, endodontists, prosthodontists, pedodontists and orthodontists (referred to below as Preferred Dental Organization Participating Providers, the relationship between The Prudential and the Preferred Dental Organization Participating Providers being one of principal with independent contractors) to form a Dental Services Network, referred to as Network.

The Purchaser desires The Prudential to furnish the following services with respect to the Plan:

- Network Services,
- Claim Processing and Related Services, and
- Administrative Services and Materials.

THEREFORE, The Prudential will perform these services for the Purchaser provided that the Purchaser makes payments for the services as provided by the terms and conditions of this Agreement. By their signatures below, The Prudential and the Purchaser agree that this Agreement is approved and its terms are accepted. The provisions on the pages which follow as listed on the Table of Contents are part of this Agreement.

| | |
|---|---|
| Date: _____ 19____ | UNIVERSAL HEALTH SERVICES, INC. |
| | (Purchaser) |
| Witness: _____ | By: _____ |
| | (Signature and Title) |
| City, State | THE PRUDENTIAL INSURANCE COMPANY OF AMERICA |
| Date: December 3¹ 19 96 | By: _____ |
| | Assistant Secretary |
| Attest: O. Russo | |

The authorized officers of The Prudential and the Purchaser have executed this Agreement in duplicate.

Ed. 3-96

1

# TABLE OF CONTENTS

AGREEMENT

I.   Obligations of The Prudential

    A.  Network Services
    B.  Claim Processing, Related Services and Predetermination of Benefits
    C.  Administrative Services and Materials

II.  Obligations of the Purchaser

    A.  Furnishing Information
    B.  Authorized Persons
    C.  Establishment of Account
    D.  Payment of Charges
    E.  Maintenance of Records
    F.  Modifications of the Plan

III. Financial Arrangements

    A.  Banking Arrangements
    B.  Charges for Services and Materials

IV.  General Provisions

    A.  Prompt Discharge of Obligations
    B.  Client Audits
    C.  Fiduciary Duty
    D.  Hold Harmless and Indemnification
    E.  Lawsuits
    F.  Practice of Dentistry and the Relationship between The Prudential and Preferred Dental
        Organization Participating Providers
    G.  Right of Final Review and Approval
    H.  Amendments
    I.  The Prudential and its Subsidiaries
    J.  Assignments
    K.  The Purchaser

V.   Termination of the Agreement

    A.  Date of Termination
    B.  Access to Network and Claim Services
    C.  Forwarding of Data
    D.  Continued Application of Certain Provisions

EXHIBIT A    PLAN OF BENEFITS

EXHIBIT B    ADMINISTRATION OF THE NETWORK

EXHIBIT C    ADMINISTRATIVE SERVICES AND MATERIALS; REPORTING AND BILLING
            DATES

EXHIBIT D    SCHEDULE OF CHARGES FOR SERVICES AND MATERIALS

EXHIBIT E    PERFORMANCE GUARANTEES

EXHIBIT F    SAVINGS GUARANTEE

## I. OBLIGATIONS OF THE PRUDENTIAL

The Prudential will arrange for Network Services, and provide the Claim Processing, Related Services and Predetermination of Benefits, and Administrative Services and Materials listed below.

### A. Network Services

1. The Prudential provides administration of the Network as described in Exhibit B.

2. The Prudential will make access to the Network available to the Purchaser for use by the employees of the Purchaser and their dependents. Access to the Network includes:

   (a) **Access to Preferred Dental Organization Participating Providers:** Access to Preferred Dental Organization Participating Providers who deliver dental care.

   It is understood and agreed that the availability of any Preferred Dental Organization Participating Provider, or class of Preferred Dental Organization Participating Providers, shall be at any time at the sole discretion of The Prudential.

   (b) **Member Services:** Access via telephone to Member Services representatives to request information on Preferred Dental Organization Participating Providers and obtain information on the Purchaser's plan of benefits.

### B. Claim Processing, Related Services and Predetermination of Benefits: The Prudential will perform the following Claim Processing, Related Services and Predetermination of Benefits.

1. **Claim Processing:** The Prudential will accept for processing and payment or denial those claims for benefits under the Plan for which proof of claim is furnished, in a form satisfactory to The Prudential. This proof must cover the occurrence, character and extent of the loss. It must be furnished within 90 days after the date of the loss, except that:

   (a) If payment under a Coverage is to be made for charges incurred during a Calendar Year proof of claim must be furnished to The Prudential not later than sixty days after the end of the calendar year in which the service or supply was provided; or

   (b) In the case of a claim for orthodontic benefits or any other benefits which provides for payment at periodic intervals, proof of claim must be furnished to The Prudential not later than ninety days after the end of the month or lesser period in which the periodic payment was due.

   However, The Prudential may at its discretion accept any claim which is submitted after the expiration of said sixty or ninety days, whichever is applicable. Claims will only be accepted up to one year from date of service.

   The Prudential will determine, in accordance with the provisions of the Plan, the amount of benefits, if any, payable for each claim received. In processing claims under the Plan, The Prudential will provide adequate notice in writing to any person whose claim for benefits under the Plan has been denied, setting forth the specific reasons for the denial, and will afford a reasonable opportunity to any person whose claim for benefits has been denied for a full and fair review by The Prudential of the decision denying the claim.

2. **Claim Investigations or Audits:** The Prudential may, at its option, investigate or audit any other claim or have the claimant examined by a doctor or dentist during pendency of claim. The selection of claims and frequency for audit will be determined by The Prudential, but, when requested by the Purchaser. The Prudential will also consider other claims for audit. Any such audit may be performed by an independent agency selected by The Prudential.

## I.  OBLIGATIONS OF THE PRUDENTIAL (Continued)

3.  Recovery of Claim Overpayments:  If and when The Prudential becomes aware of a payment made for an amount in excess of the amount properly payable under the Plan, The Prudential will take the appropriate action, in accordance with Prudential's standard procedures, to attempt to recover the excess payment.  The Prudential will not be required to enter into litigation to obtain a recovery.  Any amounts so recovered will be payable to The Prudential.

The Prudential will deposit the recovered amount in the Purchaser's account to the credit of the Purchaser and will periodically report to the Purchaser the total of the amounts recovered since the last such report.

4.  Claim Control:  At the direction, or with the consent, of the Purchaser, The Prudential will take such action as it deems appropriate (e.g., liaison with the dental community or personal visits) to attempt to reduce unreasonable fees or to eliminate unnecessary service practices

5.  Dental Predetermination of Benefits:  When a dental treatment plan is referred to The Prudential before the dental services are performed, The Prudential will review the dental treatment plan and furnish an estimate of the benefits payable under the Plan.

C.  Administrative Services and Materials:  The Prudential will provide the Administrative Services and Materials listed below and in Exhibit C.

1.  Determination of Eligibility for Coverage:  Based solely on information furnished by the Purchaser in accordance with Section II, Obligations of the Purchaser, The Prudential will determine a person's eligibility for coverage under the Plan.  The Prudential will, upon request, certify eligibility and provide details of the person's benefits to dental care providers.

2.  Financial Information

(a)  Benefit Costs Estimates:  Upon request of the Purchaser and receipt of any required information, The Prudential will furnish to the Purchaser an estimate of the benefit cost of any proposed modification or extension of the Plan.  In connection therewith, The Prudential will notify the Purchaser of any changes in the Schedule of Charges under the Agreement which would be required if the Plan under the Agreement were so modified or extended.

(b)  Financial Accounting Reports:  Upon request of the Purchaser, but not more often than annually, The Prudential will furnish to the Purchaser an analysis of the experience of the Plan which will include:

   •  An estimate of incurred but unreported claims.

   •  Benefit costs for the immediately preceding term of the Agreement.

   •  Data required for compliance with governmental reporting requirements.

3.  Recovery of Payments

(a)  The Prudential will take steps reasonably necessary according to Prudential guidelines to implement any Coordination of Benefits provisions of the Plan and will cooperate with other organizations in the implementation of similar provisions in their plans.  The Prudential will not be required to enter into litigation to obtain a recovery.

4

I. OBLIGATIONS OF THE PRUDENTIAL (Continued)

    (b) The Prudential will take steps reasonably necessary according to Prudential guidelines to implement any Third Party Liability provision of the Plan. If any payment has been made subject to the conditions of a Third Party Liability provision of the Plan, The Prudential will take appropriate action, in accordance with the terms of that provision, to attempt to recover the amount so paid. However, The Prudential will not be required to take such action for those claims where the amount of the potential recovery is less than $5,000 or to enter into litigation to obtain a recovery.

    (c) Any amounts recovered under item (a) or (b) above will be payable to The Prudential. The Prudential will deposit the recovered amount in the Purchaser's account to the credit of the Purchaser and will periodically report to the Purchaser the total of the amounts recovered since the last such report. The Prudential will notify the Purchaser whenever attempted recovery is unsuccessful; and the Purchaser will hold The Prudential harmless in accordance with Section IV. D. of this Agreement.

  4. Miscellaneous

    (a) **Benefit Plan Design:** The Prudential will, taking into account trends in employee benefits and dental care costs, assist the Purchaser in the design of the Plan and any desired revisions thereof.

    (b) **Communications and Other Materials:** The Prudential will furnish the materials specified in Exhibit C for use by the Purchaser and the Purchaser's employees.

    (c) **Financial Information and Reports:** The Prudential will furnish financial information and reports in connection with this Agreement, in addition to the Financial Accounting Reports listed above, as mutually agreed upon between The Prudential and the Purchaser.

    (d) **Record Maintenance:** The Prudential will maintain records used to perform services in accordance with The Prudential's then current rules for maintenance of records.

II. OBLIGATIONS OF THE PURCHASER

  A. **Furnishing Information:** The Purchaser will provide eligibility information identifying by name the persons participating under the Plan, the effective dates of their participation and the extent of their coverage under the Plan. The Purchaser will provide this information in a form satisfactory to The Prudential, as of the effective date of the Agreement and subsequently during the continuance of the Agreement on the Eligibility Reporting Date specified in Exhibit C. The Purchaser will make every effort to notify The Prudential of changes in a person's eligibility status at least fifteen days prior to the effective date of the change.

    The Purchaser will also provide any other information The Prudential requires in order to provide services under this Agreement.

  B. **Authorized Persons:** The Purchaser will provide The Prudential with the names of individuals authorized to act for the Purchaser in connection with this Agreement, together with details of the scope of their authority.

  C. **Establishment of Account:** The Purchaser will provide all funds for any payments for claims payable under the Plan. The Purchaser will comply with this funding obligation by making deposits to an account established for this purpose, as described in Section III. Financial Arrangements.

  D. **Payment of Charges:** The Purchaser will pay all charges assessed by The Prudential in accordance with the provisions of Section III. Financial Arrangements and Exhibit D.

## II.   OBLIGATIONS OF THE PURCHASER (Continued)

E.  Maintenance of Records:  The Purchaser will maintain records as required in order to meet its obligations under the Agreement.

F.  Modifications of the Plan:  The Purchaser will provide The Prudential with reasonable advance notice of any modifications in the Plan.

## III. FINANCIAL ARRANGEMENTS

### A. BANKING ARRANGEMENTS

Whenever The Prudential determines that payments for claims are payable under the Plan. The Prudential will withdraw the required amount from the Custodian Account known as the PruMarc Account. The PruMarc Account has been opened by The Prudential as custodian for some of its clients for whom it furnishes services in connection with uninsured benefit plans including, but not limited to, certain purchasers entering into agreements similar to this one with The Prudential. In connection with the PruMarc Account:

1.  The Purchaser agrees to instruct its designated bank(s) to honor requests to inform The Prudential of the balance in the Purchaser's account.

2.  The Purchaser acknowledges and agrees that The Prudential may effect payments for claims through the PruMarc Account with the bank designated by The Prudential.

3.  The Purchaser authorizes and directs The Prudential and its designated bank to prepare, execute and deliver Automated Clearing House Debits or Depository Transfer Checks to the Purchaser's bank(s), and to instruct the Purchaser's bank(s) to honor all Automated Clearing House Debits or Depository Transfer Checks when received.

4.  The Purchaser agrees to deposit immediately available funds sufficient to pay in full all such Automated Clearing House Debits or Depository Transfer Checks when received.

5.  The Purchaser agrees to pay a penalty assessed for late payments.  The penalty will be determined as the product of (a), (b) and (c), divided by 365, where:

    (a)  equals the amount due;

    (b)  equals the sum of the applicable prime rate on the due date at the bank holding the PruMarc account, plus 1.5 percent; and

    (c)  equals the number of days the payment is late, as determined by the bank's usual rules for crediting and debiting deposits.

### B. CHARGES FOR SERVICES AND MATERIALS

1.  Payment of Charges:  Consideration for the services performed by The Prudential under this Agreement will be paid in accordance with the Schedule of Charges set forth in Exhibit D

    For each billing date specified in Exhibit C, The Prudential will bill the Purchaser for the services performed since the date of the last such bill.

    The Purchaser will pay the billed amount to The Prudential within thirty-one days of the date of the bill.  If the Purchaser fails to remit the payment to The Prudential within thirty-one days, the Purchaser will pay the Late Fee Charge listed in Exhibit D to The Prudential.  Also, at its option, The Prudential may exercise its right to terminate this Agreement due to late payment as described in Section V. Termination of the Agreement.

6

## III. FINANCIAL ARRANGEMENTS (Continued)

2. **Changes in Charges:** The Prudential may change the Schedule of Charges as of any of these dates:

   (a) Any date the Plan, this Agreement or any administrative procedure directly supportive of the Plan or this Agreement is modified.

   (b) Any date The Prudential determines that the number of employees covered under the Plan varies 10% or more from the number covered in the month immediately preceding the later of: (i) the Effective Date of this Agreement, or (ii) the last anniversary of the Effective Date.

   (c) Any date on or after the first anniversary of the Effective Date of this Agreement.

   The effective date of a change in charges made pursuant to item (a) will be the effective date of the modification. The effective date of a change in charges made pursuant to item (b) or (c) will be the date specified in Prudential's notification to the Purchaser, provided The Prudential has given at least thirty days notice of the change, and unless the Purchaser notifies The Prudential at least thirty days prior to the specified date of its intention to terminate this Agreement as of that date.

3. **Acceptance of Late Payment:** Any fee payment remitted to and accepted by The Prudential more than thirty-one days after it is due will not establish a course of dealing, or constitute a waiver or modification, or in any way alter, amend or affect The Prudential's right to terminate this Agreement pursuant to Section V. Termination of the Agreement.

## IV. GENERAL PROVISIONS

A. **Prompt Discharge of Obligations:** The Prudential's performance of the services under this Agreement will require prompt discharge by the Purchaser of its obligations. Therefore, The Prudential will not be considered to have failed to perform its obligations under this Agreement if any delay or non-performance is due, in whole or in part, to the Purchaser's failure to promptly discharge such obligations.

B. **Client Audits:** The Purchaser may arrange for an audit to take place at any time during the normal business hours of The Prudential. The audit must be scheduled with appropriate notice and based on a prearranged agenda agreed to in advance by the appropriate office of The Prudential.

   The scope of the information to be audited and the terms and conditions of the audit must be agreed to in advance by The Prudential, the Purchaser and any third party representative chosen by the Purchaser to perform the audit. The Purchaser may not use a third party representative whose action could, in The Prudential's opinion, represent a conflict of interest.

   Any such audit must be preceded by a written agreement properly executed by the parties.

C. **Fiduciary Duty:** It is understood and agreed that the Purchaser retains complete authority and responsibility for the Plan, its operation, and the benefits provided thereunder, and that The Prudential is empowered to act on behalf of the Purchaser in connection with the Plan only as expressly stated in this Agreement or as agreed to in writing by The Prudential and the Purchaser.

7

## IV. GENERAL PROVISIONS (Continued)

The Purchaser and The Prudential agree that, with respect to Section 503 of the Employee Retirement Income Security Act of 1974. The Prudential will be the "appropriate named fiduciary" of the Plan for purposes of denial and/or review of denied claims under the Plan. In exercising its fiduciary responsibility. The Prudential will have discretionary authority to determine eligibility for coverage as described in Section I.D.1. Determination of Eligibility for Coverage: to determine the amount of benefits for each claim received; and to construe the terms of the Plan. However, the Purchaser will have the sole and complete authority to determine eligibility of persons to participate in the Plan. The Prudential's decision on any claim will be final. The Prudential will have no other fiduciary duties under the Plan.

D. Hold Harmless and Indemnification:

1. The Prudential agrees to hold harmless and indemnify the Purchaser from any Indemnifiable Losses arising out of the establishment and administration of the Network provided that it is determined that the liability therefor was the direct consequence of willful violation of applicable laws, criminal conduct or fraud on the part of The Prudential. See part F. below: the delivery of dental care is not part of The Prudential's administration of the Network.

2. The Prudential shall use the same care and skill a similarly situated provider of like service would exercise following commonly accepted insurance industry practices in the performance of its duties under this Agreement. The Purchaser agrees to hold Prudential and its directors, officers, and employees harmless from any and all claims, lawsuits, settlements, judgments, costs penalties. and expenses including attorney's fees, resulting from, or arising out of or in connection with any function of Prudential under this Agreement. unless it is determined that the liability therefor was the direct consequence of consistent or flagrant lack of such care and skill, criminal conduct or fraud on the part of Prudential or any of its directors. officers or employees.

3. Except as described in the preceding paragraphs, the Purchaser agrees to hold harmless and indemnify The Prudential from any Indemnifiable Losses arising out of or in connection with this Agreement. This includes but is not limited to Indemnifiable Losses arising in connection with the release of any information or data by The Prudential to the Purchaser, or to a third party at the request of the Purchaser.

   The Purchaser agrees to hold harmless and indemnify The Prudential from any claim overpayment for which attempted recovery has been unsuccessful, which The Prudential at its sole discretion has determined to abandon.

   The Purchaser further agrees to hold harmless and indemnify The Prudential from any levy, assessment, penalties, interest. expenses or tax arising from any benefit under the Plan or any service or transaction under this Agreement. but excluding any tax on earnings or capital gains.

   As used in this Agreement, the term Indemnifiable Losses shall include any claim, damage. lawsuit, settlement, judgment or penalty, including attorney's fees and other expenses in connection therewith.

E. Lawsuits: Either party to this Agreement which becomes aware of a lawsuit which might give rise to an indemnification under this Agreement will notify the other party promptly in writing of such lawsuit. Any delay or failure to so notify the party whose obligation it is to indemnify will only relieve that party of its obligations hereunder to the extent it is prejudiced by reason of such delay or failure.

   Either party which has been named as defendant in such a lawsuit will retain the right to conduct its own defense. However, the parties may mutually agree that one of the two parties will be responsible for the mutual defense of both parties. In any event, the two parties will consult and cooperate with the objective of coordinating the overall defense of the case.

8

## IV.   GENERAL PROVISIONS (Continued)

F.  **Practice of Dentistry and The Relationship Between The Prudential and Preferred Dental Organization Participating Providers:** It is understood and agreed that neither The Prudential nor the Purchaser is engaged in the practice of dentistry. It is further understood and agreed that the provision of dental care is not part of The Prudential's administration of the Network and that Preferred Dental Organization Participating Providers are solely responsible for the provision of dental care.

Preferred Dental Organization Participating Providers are independent contractors and none of the provisions of this Agreement will be construed to create an agency, partnership, affiliate, joint venture, or employer-employee relationship between The Prudential and any Preferred Dental Organization Participating Providers. Nor are agents or employees of Preferred Dental Organization Participating Providers agents or employees of The Prudential.

G.  **Right of Final Review and Approval:** The Prudential shall have the right of final review and approval of all material that describes the Network, the relations between the parties, the benefits or services to be delivered by the Network or the procedures to be used by the Network.

H.  **Amendments:** This Agreement, including its Exhibits, may be changed by an amendment signed by an authorized person acting on behalf of the Purchaser and an officer of The Prudential. It may also be changed by an amendment signed only by an officer of The Prudential if the amendment involves a change in the Plan that has been made automatically in accordance with Exhibit B, item 2. It is understood that changes in clinical guidelines and procedures followed in the Network are not changes in the Plan.

I.  **The Prudential and its Subsidiaries:** Any of the functions to be performed by The Prudential under this Agreement may be performed by The Prudential or any of its subsidiaries. Any reference in this Agreement to The Prudential will include its directors, officers and employees as well as the directors, officers and employees of any of its subsidiaries.

J.  **Assignments:** This Agreement is not assignable without the express written consent of The Prudential. The Prudential may, without the consent of the Purchaser, assign this Agreement, or any of its obligations under this Agreement, to any of its subsidiaries or affiliates.

K.  **The Purchaser:** Any references in this Agreement to the Purchaser will include persons authorized to act for the Purchaser in connection with this Agreement as named pursuant to Section II. Obligations of the Purchaser.

## V.   TERMINATION OF THE AGREEMENT

A.  **Date of Termination:** This Agreement will terminate when the first of the following occurs:

1.  Termination of the Plan.

2.  The day following the third consecutive business day in which available funds in the Purchaser's designated depository bank are not sufficient to pay in full Automated Clearing House Debits or Depository Transfer Checks in accordance with Section III. Financial Arrangements.

3.  The date specified in a written notice given by The Prudential to the Purchaser of its intent to terminate this Agreement because of the Purchaser's failure to remit to The Prudential charges for services within thirty-one days of the date of the bill.

4.  The date specified in notice by either The Prudential or the Purchaser to the other of its intention to terminate this Agreement, provided there has been at least thirty days prior written notice.

## V.  TERMINATION OF THE AGREEMENT (Continued)

5. Modification of the Plan. But modification of the Plan will not operate to terminate this Agreement (a) if this Agreement is amended to make the modified plan the Plan under this Agreement or (b) while this Agreement is being continued, by mutual agreement, established prior to such an amendment, between The Prudential and the Purchaser.

B. **Access to Network and Claim Services:** In the event of termination of this Agreement, no further access to the Network or further services will be furnished by The Prudential except as provided in this part B, or as mutually agreed to by The Prudential and the Purchaser.

If this Agreement is terminated for a reason other than the Purchaser's failure to fund the designated depository bank (item A.2. above) or failure to remit charges within thirty-one days of the date of the bill (item A.3. above), The Prudential will continue to perform services as described below after the termination date:

1. The Prudential will perform the Claim processing services described in Section I. Obligations of The Prudential with respect to claims for benefits that The Prudential receives by the last day of the sixth month following the month in which the termination occurred, provided that the claims are for eligible charges incurred by covered persons prior to that termination date.

2. The Prudential will continue to make payments for those claims and for Network Services rendered prior to the termination date as described in III. Financial Arrangements.

These services will be performed by The Prudential in the same manner as they would be performed if the claims had been received, or the payments had been made, prior to the termination date, except that The Prudential will charge for the services at a rate per transaction to be determined at the termination of the Agreement.

The Purchaser shall continue to perform its obligations under this Agreement in connection with these services, including but not limited to, maintaining on deposit with its depository bank sufficient funds to make all such payments.

C. **Forwarding of Data:** In the event of termination of this Agreement, The Prudential will hold records necessary to honor all claims incurred prior to termination. The Prudential will forward to the Purchaser such data as the Purchaser may reasonably require for the administration of the Plan or any plan adopted in its place. The cost incurred by The Prudential for furnishing this data will be inventoried and charged to the Purchaser.

D. **Continued Application of Certain Provisions:** If this Agreement terminates, the provisions of Section IV. General Provisions will continue to apply to any loss or cause of action arising in connection with this Agreement or out of any function of The Prudential under this Agreement prior to its termination.

HOU/99123-0500 3901

# AMENDMENT
## of
## AGREEMENT NO. 23794

between

### THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
(Called "Prudential")
and
### UNIVERSAL HEALTH SERVICES, INC.
(Called "Purchaser")

By their signatures below, Prudential and the Purchaser agree that the ADMINISTRATIVE SERVICES Agreement which became effective January 1, 1997 is changed as follows:

The page listed in Column I below is attached to this Amendment and forms part of the Administrative Services Agreement as of such page's effective date. The page listed in Column I replaces, as of its effective date, the corresponding page, if any, listed in Column II.

| Column I | Column II |
|---|---|
| E-1A, effective April 1, 1999 | E-1, effective January 1, 1997 |
| E-2A, effective April 1, 1999 | E-2, effective January 1, 1997 |

| | | |
|---|---|---|
| Date at | November 8, 1999<br>Sugar Land, TX | THE PRUDENTIAL INSURANCE COMPANY OF AMERICA |
| Attest | Susan Goldsmith | By _____ |
| Date | _____ | UNIVERSAL HEALTH SERVICES, INC.<br>(Purchaser) |
| Witness | _____ | By _____<br>(Signature and Title) |

23794AA

Agreement No. 23794
Effective Date: January 1, 1997

EXHIBIT A
OF AGREEMENT NO. 23794
between The Prudential and the Purchaser

Plan of Benefits

It is understood and agreed that:

(1) The Purchaser shall furnish to Prudential a written Plan Document, booklet or other description of the Plan of Benefits for attachment to this Exhibit A.

(2) Prior to the Purchaser's completion of the written Plan Document, booklet or other description of the Plan of Benefits, Prudential shall furnish the Services described in this Administrative Services Agreement in accordance with instructions given by the Purchaser, whether given in writing, verbally or otherwise, and such instructions shall constitute the Plan of Benefits referred to in this Administrative Services Agreement.

Agreement No. 23794

Effective Date: January 1, 1997

EXHIBIT B
OF AGREEMENT NO. 23794
between The Prudential and the Purchaser

Administration of the Network

The following functions are performed in connection with the administration of the Network:

1.  **Management of the Network.** This includes but is not limited to negotiating with and selecting Preferred Dental Organization Participating Providers; providing for the reimbursement of Preferred Dental Organization Participating Providers; credentialing and monitoring of Preferred Dental Organization Participating Providers to include review of dentist licensing and board status as well as review of member complaints; and general coordination of the Network.

2.  **Negotiation with Preferred Dental Organization Participating Providers to change the services offered in particular areas.** When such a change is negotiated between The Prudential and Preferred Dental Organization Participating Providers in one of the areas included in the Network for the Plan, The Prudential and the Purchaser will arrange for an appropriate amendment to be made to the Plan and to this Agreement. It is understood that changes in clinical guidelines and procedures followed in the Network are not changes in the Plan.

3.  **Utilization management.** Review to determine appropriateness and necessity of dental care and other eligible services and supplies.

Agreement No. 23794
Effective Date: January 1, 1997

EXHIBIT C
OF AGREEMENT NO. 23794
between The Prudential and the Purchaser

Administrative Services and Materials:
Reporting and Billing Dates

I. ADMINISTRATIVE SERVICES AND MATERIALS

Communications and other Materials

A. The Prudential will, where requested by the Purchaser, prepare and furnish the following Communications and other Materials:

1. Text of any amendments to the Agreement, including any amendment changing the Plan under the Agreement.

2. For distribution to persons participating under the Plan, (i) supplies of enrollment forms; (ii) I.D. cards; and (iii) Access to Provider Directory information and updates listing Preferred Dental Organization Participating Providers.

3. One draft copy of the booklet and/or other communication material describing the benefits and other conditions of the Plan as agreed to by The Prudential and the Purchaser.

4. A supply of forms to be used for submission of claims for benefits under the Plan and instructions for their use.

5. A supply of forms to be used in administering the Plan and instructions for their use.

The Prudential will also provide revisions of the booklets and/or other communication material when the Plan is revised, if requested by the Purchaser.

B. The Prudential will provide the materials listed above for use by the Purchaser and the Purchaser's employees. Materials will be of the type and quantity normally prepared by The Prudential and will be provided according to Prudential's standard procedures.

Customized Orders: The Purchaser may also request a Customized Order. A Customized Order consists of any of the following:

1. Materials not normally prepared by The Prudential;

2. Materials prepared according to specifications that are not standard for The Prudential;

3. A quantity of materials that exceeds the quantity normally produced by The Prudential; or

4. More than one draft version prior to the final version of any materials.

5. Any other specifications unique to the Purchaser, such as special printing requirements or shipping instructions, that result in expenses not normally incurred by The Prudential for release of such materials.

Materials supplied in accordance with any such Customized Orders will be accommodated, subject to payment of the charges specified in Exhibit D.

C-1

## II.  REPORTING AND BILLING DATES

Eligibility Reporting Dates:  The Purchaser will furnish eligibility information as required under Section II of the Agreement as of the following dates:

January 1, 1997 and the first day of each month thereafter.

Billing Dates:  The Prudential will bill the Purchaser as of the following dates:

January 1, 1997 and the first day of each month thereafter.

Agreement No 23794
Effective Date: January 1, 1997

### EXHIBIT D
### OF AGREEMENT NO. 23794
between The Prudential and the Purchaser

#### Schedule of Charges for Services and Materials

I.   Basic Fee: $2.60* per employee covered under the Plan of Benefits, per month.

This fee covers the following services and materials:

* Administration of the Network described in Exhibit B.

* Network Services listed in Section I, Obligations of The Prudential

* Claim Processing and Related Services, other than audits and Claim Control activities requested by the Purchaser

* The following Administrative Services and Materials:

  * Eligibility maintenance

  * Financial Accounting Reports listed in Section I, Obligations of The Prudential

  * Recoveries of Payments described in Section I, Obligations of The Prudential

  * Communications and other materials described in Exhibit C, other than Customized Orders.

* Initial enrollment meetings

* Access to The Prudential's standard toll-free telephone services

II.   Inventoried Costs:  The charge for the following materials and services will be the actual cost as inventoried.

1.   Customized Orders of communications and other materials

2.   Reports requested by the Purchaser, other than the Financial Accounting Reports listed in Section I, Obligations of The Prudential.

3.   Forwarding data to the Purchaser upon termination of the Agreement.

4.   Audits and claim control activities requested by the Purchaser.

III.   Late Fee:

For each fee payment remitted to The Prudential more than thirty-one days after the billing date: 1½% of the billed amount for each month or portion thereof that it is overdue. Such late fee charge will commence on the thirty-second day after the billing date.

*Effective January 1, 1998, and January 1, 1999, the Basic Fee will be based upon the CPI - W + 2% (Consumrer Price Index + 2%).

Agreement No. 23794
Effective Date: April 1, 1999

**EXHIBIT E**
**OF AGREEMENT NO. 23794**
between The Prudential and the Purchaser

Performance Guarantees

Claim Financial Accuracy

Definition:   Total claim dollars paid correctly divided by total claim dollars paid.
Dollars paid correctly is calculated by subtracting gross payment errors
from total claim dollars paid.

| Performance Standard | Percentage of Fees Penalty | Measurement Frequency | Measurement Method |
|---|---|---|---|
| 99.0% or more | 0 | Annual | Prudential Reports |
| 98.5% - 98.9% | 1% Penalty | Annual | Prudential Reports |
| 98.49% or lower | 2% Penalty | Annual | Prudential Reports |

Claim Processing Accuracy

Definition:   Total number of checks issued without errors divided by the total number
of checks issued. "Errors" includes errors in amount paid, spelling, coding,
or other financial, numerical, or typographical details.

| Performance Standard | Percentage of Fees Penalty | Measurement Frequency | Measurement Method |
|---|---|---|---|
| 90% or more | 0 | Annual | Prudential Reports |
| 86% - 89.9% | 1% Penalty | Annual | Prudential Reports |
| 85.9% or lower | 2% Penalty | Annual | Prudential Reports |

Claim Turnaround Accuracy

Definition:   Total number of calendar days required to process claims divided by the total
number of claims paid. Claims are considered processed when the claim is
authorized for payment by the examiner.

| Performance Standard | Percentage of Fees Penalty | Measurement Frequency | Measurement Method |
|---|---|---|---|
| 90% or more processed in 15 days | 0 | Annual | Prudential Reports |
| Less than 90% in 15 days | 1% Penalty | Annual | Prudential Reports |

## Telephone Responsiveness

Definition: Percentage of member service calls answered within standard. Responsiveness will be measured from the time a call is answered by the automated telephone system to the time the caller reaches a member service representative or interactive voice response prompt.

| Performance Standard | Percentage of Fees Penalty | Measurement Frequency | Measurement Method |
|---|---|---|---|
| 85% or more answered in 30 seconds | 0 | Annual | Prudential Reports |
| Less than 85% | 1% Penalty | Annual | Prudential Reports |

## Telephone Abandonment Rate

Definition: Percentage of member service calls that are abandoned before reaching the member services representative. "Abandoned" refers to instances where the member hangs up and terminates the phone call.

| Performance Standard | Percentage of Fees Penalty | Measurement Frequency | Measurement Method |
|---|---|---|---|
| Less than 5% | 0 | Annual | Prudential Reports |
| 5% or more | 1% Penalty | Annual | Prudential Reports |

E-2A

EXHIBIT C

November 5, 1997 letter to Plaintiff

950 P01/01 NOV 05 '97   11:36

 **Prudential**

Timothy J. Nemec
Account Executive

Prudential Health Care
250 Gibraltar Road, P. O. Box 950
Horsham, PA  19044-0950
Phone (215) 443-3718  Fax (215) 443-2095

November 5, 1997

| Post-It® Fax Note | 7671 | Date 11/5/97 | # of pages ▶ 1 |
|---|---|---|---|
| To Nancy Kurtzman | | From Jim Nemec | |
| Co./Dept. | | Co. | |
| Phone # | | Phone # | |
| Fax # 610-768-3485 | | Fax # | |

Ms. Nancy Kurtzman
Director of Employee Benefits
Universal Health Services, Inc.
367 South Gulph Road
King of Prussia, PA  19406

Dear Nancy:

As you well know, we have experienced systems problems which have prevented us from processing employee and dependent Dental plan enrollment data.  This has resulted in certain individuals not being shown as eligible for benefits as quickly as they should have been.  Many steps have been taken to correct this situation and we are again processing enrollment information in a prompt and efficient manner.

During this effort, it became clear that we have severely inconvenienced individuals from George Washington University Hospital.  While we cannot change what has happened, we must apologize to associates at George Washington, as well as to you and your staff, for the inconvenience we have caused and assure you that the procedures now in place will prevent this from happening again.

Sincerely,

Timothy J. Nemec
Account Executive

 TJN:lkl

uhs/tn1105

EXHIBIT D

April 1, 1999 termination letter

**UHS**

Universal Health Services, Inc.
UHS of Delaware, Inc.

367 South Gulph Road
P.O. Box 61558
King of Prussia
Pennsylvania
19406-0958

610-768-3300.

April 1, 1999

Mr. Timothy Nemec
Account Executive
Prudential HealthCare
250 Gibraltar Road, P.O. Box 950
Horsham, PA 19044-0950

Re:    Administrative Services Agreement

Dear Tim:

This is inform you that Universal Health Services, Inc. is terminating our agreement with Prudential effective May 31, 1999. We are transferring the services to Metropolitan Life. It is our expectation that Prudential will continue to process all claims with dates of service incurred before June 1, 1999, until the one year claim submission deadline of 5/31/2000. This will ensure that the appropriate network determination applies to each claim.

I will contact you to discuss the full transition. Most importantly, we will need a history tape by May 15, 1999, to provide Metropolitan with deductibles and maximums and a contact person responsible for facilitating the transition.

Based on your letter of March 18, 1999 to Jan Kelly, we will plan to deduct the performance standard rebate of $13,372 from our May ASO bill. I will expect to hear from you before that bill is generated, if your internal audit department provides you with an adjusted figure.

Tim, I regret that we were unable to satisfactorily resolve the eligibility problems that have been plaguing us for some time and trust that you will fully understand the reason for our decision to move the business.

I will be in touch shortly.

Sincerely,

Nancy Kurtzman
Director of Employee Benefits

c.c.    Kirk Gorman
        Jan Kelly
        Ross Taylor
        Ginny Cullinan
        Heather Klosinski

# EXHIBIT 4

## SUMMONS IN A CIVIL ACTION

| UNITED STATES DISTRICT COURT | District<br><br>EASTERN DISTRICT OF PENNSYLVANIA |
|---|---|

| | Docket No.<br><br>CIVIL ACTION NO. 02-CV-2715 |
|---|---|

UNIVERSAL HEALTH SERVICES, INC. and
UNIVERSAL HEALTH SERVICES, INC.
FLEXIBLE BENEFIT PLAN, UHS
DENTAL COMPONENT

                    Plaintiffs

        vs.

AETNA, INC. and
PRUDENTIAL INSURANCE COMPANY OF AMERICA

                    Defendants

To: (Name and Address of Defendant)

Prudential Insurance Company of
America
55 North Livingston Road
Roseland, NJ 07068-1732

---

### YOU ARE HEREBY SUMMONED and required to serve upon

Plaintiff's Attorney (Name and Address)

William J. Brennan, Esquire
Butera, Beausang, Cohen & Brennan
630 Freedom Business Center, Suite 212
King of Prussia, PA 19406

an answer to the complaint which is herewith served upon you, within
days after service of this summons upon you, exclusive of the day of service.
If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint.

| Clerk<br><br>     MICHAEL E. KUNZ | Date<br><br>August 22, 2002 |
|---|---|
| (By) Deputy Clerk | |

# EXHIBIT 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNIVERSAL HEALTH SERVICES, INC. and :      NO.    02-CV-2715
UNIVERSAL HEALTH SERVICES, INC.        :
FLEXIBLE BENEFIT PLAN, UHS            :
DENTAL COMPONENT                      :
                                      :
                     Plaintiffs       :
                                      :
          vs.                         :
                                      :
                                      :
AETNA, INC. and                       :
PRUDENTIAL INSURANCE COMPANY           :
OF AMERICA                            :
                                      :
                                      :
                     Defendants       :

### AFFIDAVIT OF SERVICE

The undersigned certifies that a copy of a Summons in Complaint was served upon

Prudential Insurance Company of America, 55 North Livingston Road, Roseland, New Jersey,

07068-1732 by Certified Mail, Return Receipt Requested and that the service was effected on

August 26, 2002.  A copy of the return card is attached hereto as Exhibit "A."


                                        _William J. Brennan_
                                        William J. Brennan


Sworn to and subscribed before me

the _3rd_ day of September, 2002.

_Kathleen A. Washkalovitch_
            Notary Public


NOTARIAL SEAL
Kathleen A. Washkalavitch, Notary Public
Upper Merion Twp., Montgomery County
My Commission Expires April 30, 2005

VHS - AETNA

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X ☐ Agent ☐ Addressee<br>B. Received by ( *Printed Name* )    C. Date of Delivery |
| 1. Article Addressed to:<br>Prudential Insurance Company<br>of America<br>55 North Livingston Road<br>Roseland, NJ 07068-1732 | D. Is delivery address different from item 1?  ☐ Yes<br>   If YES, enter delivery address below:  ☐ No<br><br>ROSELAND NJ<br>AUG 2 6 2002<br><br>3. Service Type<br>☐ Certified Mail   ☐ Express Mail<br>☐ Registered      ☐ Return Receipt for Merchandise<br>☐ Insured Mail    ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*)   ☐ Yes |
| 2. Article Number<br>(*Transfer from service label*) | 7001 1940 0001 0484 0445 |

PS Form **3811**, August 2001     Domestic Return Receipt     102595-01-M-2509

**EXHIBIT**

*A*